UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DESIGN PROFESSIONALS INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff/Counter-Defendant, | )<br>) |
| v. | )<br>)<br>) |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, | )<br>) No. 04 C 5214<br>) |
| Defendant/Counter-Plaintiff/Third Party Plaintiff/Third Party Counter-Defendant. | ) Judge Joan H. Lefkow<br>)<br>)<br>) |
| CAMPBELL TIU CAMPBELL, INC. | )<br>) |
| Third-Party Defendant/Third-Party Counter-Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, | )<br>)<br>) |
| Third-Party Counter-Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Design Professionals Insurance Company ("DPIC") filed this action against St. Paul Fire & Marine Insurance Company ("St. Paul"), alleging that St. Paul breached its duty to defend Campbell Tiu Campbell, Inc. ("Campbell"), an architectural firm, in a personal injury action filed against Campbell in the Circuit Court of Cook County. DPIC seeks reimbursement from St. Paul for the costs it incurred in defending and settling the underlying lawsuit on behalf of Campbell. St. Paul has asserted a counterclaim for declaratory judgment against DPIC and a third-party complaint for

declaratory judgment against Campbell. Campbell subsequently filed a counterclaim against St. Paul, seeking recovery of the deductible that it paid as part of DPIC's settlement of the underlying lawsuit. The court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity among the parties. Before the court are cross motions for summary judgment on the issue of St. Paul's duty to defend Campbell in the underlying personal injury litigation. For the reasons set forth below, the Court denies St. Paul's motion for summary judgment and grants DPIC/Campbell's motion for summary judgment.

I. **SUMMARY JUDGMENT STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## II. BACKGROUND

### A. The Underlying Lawsuit

In July of 1998, Campbell entered into a Professional Services Agreement with East Lake Travis Joint Venture ("East Lake") for the performance of architectural and design services for the Bronzeville Military Academy. (St. Paul's Statement of Material Facts ¶ 9, hereinafter "St. Paul ¶ ___"). The agreement identified Campbell's duties and responsibilities and specified that such duties did not include "mak[ing] exhaustive or continuous on-site observations to ascertain the quality or quantity of the work . . . ." or being "responsible for construction means and methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work or for the act or omissions of the contractor, subcontractors, or any other persons performing any of the work in accordance with the Contract Documents." (St. Paul ¶ 10).

On March 26, 1999, Wayne T. Bell ("Bell") filed a complaint against Campbell, East Lake, the City of Chicago, and the Chicago Public Schools in the Circuit Court of Cook County. (DPIC's Statement of Material Facts ¶ 7, hereinafter "DPIC ¶ ___"; St. Paul ¶ 13). In this complaint, Bell alleged that he was injured on October 26, 1998 when a wall collapsed on him while he was working on the construction project at the Bronzeville Military Academy. (DPIC ¶ 9; St. Paul ¶ 11). Bell further claimed that Campbell, the construction project's architect, was negligent and that Campbell's negligence proximately caused his injuries. (DPIC ¶¶ 10-11; St. Paul ¶ 14).

3

Specifically, Bell alleged that Campbell

   a) failed to provide, place or cause the use of safe, suitable, and proper scaffolds, supports or other mechanical contrivances for the movement, lifting and placement of persons, equipment and materials on the third floor of said rehabilitation project;

   b) failed to provide, place or cause the use of scaffolds, ladders or other mechanical contrivances to provide proper and adequate protection to the life and limb of the plaintiff while engaged in the process of rehabilitating the subject building;

   c) failed to provide a safe, suitable, and proper scaffold, work platform, and/or other device for the plaintiff to stand upon to perform his work;

   d) failed to provide, place or cause the use of safe and suitable braces or supports for the ceiling and walls during the rehabilitation project;

   e) directed, caused or permitted the placement of certain braces or supports in and about the building's third floor which were inadequate and/or improperly placed; and

   f) directed, caused or permitted the plaintiff to work in an unsafe area.

(DPIC ¶ 11; St. Paul ¶ 14).

Thereafter, on April 13, 2000, the Board of Education of the City of Chicago (the "Board") filed a crossclaim for contribution against Campbell, alleging that Campbell "had the duty to exercise ordinary care . . . in the erection, construction, placement of supports and bracing, operation, demolition, and rehabilitation of the subject premises . . . ." (DPIC ¶¶ 12, 13). The Board also alleged that Campbell had "[f]ailed to provide the Plaintiff with a safe place within which to work; [f]ailed to provide, place or cause the use of scaffolds, ladders, or other mechanical contrivances to provide proper and adequate protection . . .;" and "[f]ailed to provide, place or cause the use of safe and suitable braces or supports for the ceilings and walls. . . ." (DPIC ¶ 13).

### B. The St. Paul Policy

St. Paul issued a commercial general liability insurance policy to Campbell with a policy

4

coverage period of September 10, 1998 to September 10, 1999. (DPIC ¶ 17; St. Paul ¶ 6). The policy stated that St. Paul would "pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that: happens while this agreement is in effect; and is caused by an event." (DPIC ¶ 18). The St. Paul policy further provided, in the "Who Is Protected Under This Agreement" portion of the policy, that "any person or organization shown in the Coverage summary as an architect, engineer or surveyor is a protected person. But only for covered injury or damage that results from .... your work." (DPIC ¶ 20).

The St. Paul policy defined "your work" as "work that you're performing for others or others are performing for you; or service that you're providing for others or others are providing for you." (St. Paul ¶ 19). The policy defined "architect, engineer, or surveyor professional services as including "the preparation or approval of any drawing and specification, map, opinion, report, or survey, or any change order, field order, or shop drawing; and any architectural, engineering, inspection, or supervisory activity." (DPIC ¶ 23; St. Paul ¶ 20).

The St. Paul policy also contained certain exclusions. The policy specified that "the architect, engineer, or surveyor isn't a protected person for injury or damage that results from the performance or the failure to perform architect, engineer, or surveyor professional services." (DPIC ¶ 20). The St. Paul policy also stated, "We won't cover injury or damage or medical expenses that result from the performance of or the failure to perform any professional service. Nor will we cover injury or damage that result from any support activities to the profession, such as secretarial or clerical." (DPIC ¶ 21). Additionally, the St. Paul policy contained an "Architect, Engineer, or Surveyor Professional Services Exclusion Endorsement," which provided, "We won't cover injury or damage or medical expenses that result from the performance of or failure to perform architect,

5

engineer or surveyor professional services by or for you." (DPIC ¶ 22).

With regard to "other insurance," the St. Paul policy stated:

This agreement is primary insurance. If there is any other valid and collectible insurance for injury or damage covered by this agreement, the following applies in connection with other insurance:

Other primary insurance. When there is other primary insurance, we'll share with that insurance the amounts you're legally required to pay as damage for injury or damage covered by this agreement."

(DPIC ¶ 24).

Finally, the St. Paul policy contained the following provision regarding its duty to defend: "We'll have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service." (DPIC ¶ 19).

### C. The DPIC Policy

DPIC issued a professional liability insurance policy to Campbell with a policy coverage period of March 31, 1998 to March 31, 1999. (DPIC ¶ 14, St. Paul ¶ 7). The DPIC policy provided, "We will pay those sums in excess of the Deductible that you become legally obligated to pay for CLAIMS related to your PROFESSIONAL SERVICES to which this policy applies." (St. Paul ¶ 9).

The DPIC policy also contained the following "other insurance" provision:

This insurance is excess over any other insurance, whether primary, excess, contingent, or any other basis, and specific exclusions in this policy always apply. When this insurance is in excess, we will not defend any CLAIM that any other insurer has a duty to defend. If no other insurer defends, we have the right but not a duty to do so. If we defend, we will be entitled to your rights against all other insurers.

6

(DPIC ¶ 15). Finally, the DPIC policy contained the following subrogation clause:

> You and the Company may have rights to recover all or part of any payment you or the Company make under this policy. If so, those rights are transferred to us. You must do nothing to impair them. At our request, you will bring suit to transfer those rights to us and help us enforce them.

(DPIC ¶ 16).

### D.    Defense of the Bell Lawsuit

In the Bell lawsuit, Campbell requested a defense from both DPIC and St. Paul. (DPIC ¶ 25). St. Paul denied Campbell's request for a defense, denied coverage for the lawsuit, and failed to file a declaratory judgment action for a judicial determination of its duty to defend. (DPIC ¶ 27). DPIC defended and ultimately settled the Bell lawsuit on behalf of Campbell. (DPIC ¶¶ 26, 28).

On or about April 6, 2001, St. Paul received a letter of the same date from David A. Howard, defense counsel for Campbell in the Bell lawsuit, to Tom Pontikis, counsel for East Lake regarding East Lake's counterclaim against Campbell in the underlying lawsuit. (DPIC Statement of Additional Material Facts ¶ 34, hereinafter "DPIC Add. ¶ ___").[1] A few months later, in August of 2001, St. Paul received a letter dated August 14, 2001 from David A. Howard regarding East Lake's counterclaim and tender of defense to Campbell in the Bell lawsuit. (DPIC Add. ¶ 35). DPIC first tendered to St. Paul by letter dated July 28, 2003. (St. Paul ¶ 17). In the letter, DPIC requested that St. Paul reimburse DPIC for fifty percent of the total amount incurred by DPIC in defending and settling the Bell lawsuit. (St. Paul ¶ 17).

---

[1] In response to paragraph 34 of DPIC's Statement of Additional Material Facts, St. Paul disputes that it received a copy of this letter on April 6, 2001 while admitting that it received the letter at a later time. St. Paul's response did not contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon," as required by Local Rule 56.1(a). Thus, the court deems admitted the facts contained in this paragraph. *See* L.R. 56.1(a); *McGuire v. United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998)("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission.").

### E. Present Matter

The parties, with the concurrence of the court, agreed to separate the present case into two phases: (1) whether St. Paul breached its duty to defend Campbell in the underlying Bell lawsuit, and, if so, whether St. Paul is now estopped from asserting any coverage defenses; and (2) if necessary, whether St. Paul has a duty to indemnify, and, if so, what is the amount of its obligation to DPIC and Campbell. This opinion addresses only the parties' cross motions for summary judgment on St. Paul's duty to defend.

## III. DISCUSSION

### A. Choice of Law

Because the St. Paul policy does not contain a choice of law provision, the court must determine which state's laws govern this policy. The parties tacitly agree that Illinois law governs. Likewise, the court finds that Illinois law governs the St. Paul policy.

A federal court sitting in diversity applies the choice-of-law rules in the forum state, which, in this case, is Illinois. *See Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.*, 368 F.3d 944 at 949 (7th Cir. 2004) (citations omitted). Under Illinois law, when an insurance policy lacks a choice of law provision, the court employs a "most significant contacts" test to determine the rights and responsibilities of the parties to the insurance policy. *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 527, 665 N.E.2d 842, 845 (Ill. 1995). This test requires the court to examine the (1) location of the policy's subject matter; (2) place of the policy's delivery; (3) domicile of the insured and insurer; (4) place of the last act giving rise to a valid contract; (5) location of performance; and (6) any other place bearing a rational relationship to the general contract. *Id.*

Here, the policy was delivered in Illinois; the policy was issued to an Illinois corporation whose operations are located entirely in Illinois; the place of performance of the contract is Illinois; the last act giving rise to a valid contract was in Illinois; and the underlying lawsuit for which coverage is disputed was filed in Illinois. Such factors demonstrate that Illinois has the most significant contacts with the St. Paul Policy, and the court will therefore apply Illinois law.

**B.     St. Paul's Duty to Defend**

Under Illinois law, the construction of an insurance policy and its provisions is a question of law. *Outboard Marine Corp.* v. *Liberty Mutual Ins. Corp.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1212 (Ill. 1992). A court must construe the policy with concern for the intent of the parties upon contracting. *Id.* To establish the meaning of the policy's language and the parties' intent, the court looks to the policy as a whole "with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract." *Id.* Where the words of a policy are unambiguous, the court gives them their "plain, ordinary, and popular meaning." *Id.* Language that is subject to more than one interpretation is ambiguous and must be interpreted in favor of the insured. *Id.*

To determine whether an insurer has a duty to defend, the court compares the allegations of the underlying complaint with the relevant provisions of the insurance policy. *Crum & Forster Managers Corp.* v. *Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073, 1081 (Ill. 1993); *U.S. Fid. & Guar. Co.* v. *Wilkin Insulation Co.*, 144 Ill. 2d 64, 73, 578 N.E.2d 926, 930 (Ill. 1991). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the insured in the underlying action." *Crum*, 156 Ill. 2d at 393, 620 N.E.2d at 1079. *See also Employers Ins. of Wausau* v. *Ehlco Liquidating Trust*, 186 Ill. 2d 127 at 153, 708 N.E.2d 1122 at 1136 (Ill. 1999) ("[W]here an

underlying complaint alleges facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent") (internal quotations and citation omitted). The allegations of the underlying complaint must be construed liberally, and any doubt as to coverage must be resolved in favor of the insured. *Wilkin*, 144 Ill. 2d at 74, 578 N.E.2d at 930. The insurer may not refuse to defend unless "it is *clear* from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *Ehlco*, 186 Ill. 2d at 153, 708 N.E.2d at 1136 (internal citations omitted) (emphasis in original). All provisions of an insurance policy must be read in light of each other to determine if any ambiguity exists. *Continental Casualty Co. v. McDowell & Colantoni*, 282 Ill. App. 3d 236, 241, 668 N.E.2d 59, 62 (Ill. App Ct. 1996). Any ambiguity will be construed against the drafter of the policy in favor of coverage. *Id.*

The St. Paul policy provided insurance coverage for bodily injuries arising from "your work," which was defined as "work that you're performing for others or others are performing for you; or service that you're providing for others or others are providing for you." At the same time, the policy excluded from coverage "injury or damage or medical expenses that result from the performance of or failure to perform architect, engineer or surveyor professional services by or for you." The policy defined "architect, engineer or surveyor professional service" as including "the preparation or approval of any drawing and specification, map, opinion, report, or survey, or any change order, field order, or shop drawing," or "any architectural, engineering, inspection, or supervisory activity." In the underlying litigation, Bell's complaint included the allegations that Campbell was negligent in failing to provide proper scaffolding, ladders, work platforms, braces and supports. Thus, the question before the court is whether such allegations fell within or potentially

10

fell within the coverage of the St. Paul policy, thereby triggering St. Paul's duty to defend Campbell in the Bell lawsuit.[2]

As alleged in the underlying lawsuit, a collapsing wall at the Bronzeville Military Academy injured Bell because Campbell failed to provide proper braces, supports, ladders, etc. As alleged, it is fair to say that Bell's injuries arose from Campbell's work on the project, and, accordingly, fall within the coverage of the St. Paul policy unless excluded by the policy's professional services exclusion. The court agrees with St. Paul that the policy enunciates in clear terms that Campbell was only an insured under the St. Paul policy for claims other than its provision of any architectural, engineering, inspection or supervisory services. The activities that the St. Paul policy expressly excludes from coverage are activities that require the expertise or "professional" skills and knowledge of an architect, engineer, etc. A party hires an architect or engineer or surveyor to provide the professional services of "prepar[ing] or approv[ing] drawings, specifications, maps, opinions, reports, surveys," and the like. For example, injuries arising from Campbell's negligent preparation of a building design would fall outside of the St. Paul policy's coverage. Had Bell alleged only that he was injured as the result of Campbell's negligence in the design, plans, or specifications of the wall that collapsed on him or Campbell's negligent supervision of the

---

[2]Unfortunately, neither party offers much of an explanation as to *why* failing to provide proper scaffolding, ladders, braces, etc. was or was not an "architect, engineer or surveyor professional service" or "architectural, engineering, inspection, or supervisory activity." Nowhere in the multitude of briefs filed on the cross motions for summary judgment does St. Paul discuss or analyze the actual content of Bell's complaint in light of the language of the St. Paul policy. Instead, St. Paul argues that the language of the St. Paul policy "clearly" excluded coverage for claims resulting from its provision of any architectural, engineering, inspection, or supervisory activity. Because Campbell's involvement in the underlying litigation arose from its work on the construction project, St. Paul asserts Campbell was not an insured under the terms and conditions of the St. Paul policy. Similarly, DPIC and Campbell cite to the language of the St. Paul policy and then conclude that the allegations of Bell's complaint "clearly" fall outside the policy's exclusions. Neither method of "argument" provides much assistance to the court in resolving the issue of whether the allegations of Bell's complaint fell within or potentially fell within the coverage of the St. Paul policy.

11

construction, the St. Paul policy would exclude coverage for those injuries.

At the same time, the St. Paul policy is not clear that providing appropriate scaffolding, ladders, work platforms, braces and supports are "professional" activities or services within the meaning of the policy. Such activities do not necessitate the same degree of specialization or expertise as, for example, the preparation of designs or drawings. *See Pekin Insur. Co. v. L.J. Shaw Co.*, 291 Ill. App. 3d 888 at 892, 684 N.E.2d 852 at 856 (Ill. App. Ct. 1997) ("professional service" in the context of an insurance policy exclusion "refers to any business activity conducted by the insured that involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual.") (citation omitted). Instead, such activities are incidental to the professional services offered by an architect or engineer and involve the physical or manual activities at the construction site. Because it was not clear from the face of Bell's complaint that the allegations fell outside the coverage of the St. Paul policy, St. Paul had a duty to resolve any doubt in favor of its insured, Campbell, and to defend even potentially covered activities. *See Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823 at 828 (7th Cir. 1992) (noting that an insurance policy is ambiguous "if it is subject to more than one reasonable interpretation . . . . All doubts and ambiguities must be resolved in favor of the insured.") (citation omitted).

### C. Estoppel

When allegations in an underlying complaint fall within or potentially fall within the coverage of an insurance policy, Illinois law requires the insurer to defend the suit under a reservation of rights, or, in the alternative, to promptly seek a declaratory judgment declaring that there is no coverage. *Ehlco*, 186 Ill. 2d at 150-51, 708 N.E.2d at 1134-35. If an insurer, like St. Paul, fails to undertake either course of action and is later found to have denied coverage wrongfully,

the insurer is estopped from raising policy defenses to coverage. 186 Ill. 2d at 151, 708 N.E.2d at 1135; *Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill.2d 178, 209, 579 N.E.2d 322, 335 (Ill. 1991). "Once the insurer breaches its duty to defend...the estoppel doctrine has broad application and operates to bar the insurer from raising...even those defenses that may have been successful had the insurer not breached its duty to defend." *Ehlco*, 186 Ill. 2d at 151-52, 708 N.E.2d at 1135. Additionally, estoppel is applicable irrespective of whether another insurer defended the insured. *See Aetna Cas. & Sur. Co. v. Prestige Cas. Co.*, 195 Ill. App. 3d 660, 665, 553 N.E.2d 39, 42 (Ill. App. Ct. 1990).

Although it is "well established...that the allegations in the complaint in the underlying action determine an insurer's duty to defend its insured," *Fid. & Cas. Co. of N.Y. v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301 at 304, 461 N.E.2d 471 at 473 (Ill. App. Ct. 1983), St. Paul suggests that the Court should look beyond the complaint to consider the Professional Services Agreement, which details the scope of Campbell's duties and responsibilities on the Bronzeville Military Academy project, to determine whether Campbell was an insured, and therefore, whether St. Paul had a duty to defend.

St. Paul cites to *Envirodyne* for the proposition that this Court may look outside the four corners of the complaint in determining whether it had a duty to defend. In *Envirodyne*, the insurer, Fidelity, defended its insured, Envirodyne, under a reservation of rights and concurrently filed suit for declaratory judgment. The trial court granted Fidelity's motion for declaratory judgment and Envirodyne subsequently appealed. The Illinois Court of Appeals approved the trial court's examination of material outside the four corners of the underlying complaint, holding that "*if an insurer opts to file a declaratory proceeding, we believe that it may properly challenge the existence*

of such a duty by offering evidence to prove that the insured's actions fell within the limitations of one of the policy's exclusions." 122 Ill. App. 3d at 304, 461 N.E.2d at 473 (emphasis added). St. Paul, however, did not defend its insured under a reservation of rights or file a declaratory proceeding. Thus, St. Paul is estopped from raising exclusions or noncoverage as a defense. *Insurance Co. v. Federal Kemper Ins. Co.*, 291 Ill. App. 3d 384 at 387, 683 N.E.2d 947 at 949 (Ill. App. Ct. 1997) ("Generally, if the insurer fails to exercise either of these two options and refuses to defend an insured who ultimately incurs an adverse judgment, the insurer is estopped from raising policy exclusions or noncoverage in any subsequent action . . . .") (citation omitted). In fact, the Illinois Court of Appeals emphasized this exact distinction in *Envirodyne* when it stated in *dicta*,

> We believe it important to distinguish this case, where the insurer exercised its options to defend under a reservation of rights and to file a declaratory judgment action, from those cases where the insurer elects neither option and refuses to defend an insured who ultimately incurs an adverse judgment. In the latter case, the insurer is estopped from raising non-coverage as a defense to an action brought to recover policy proceeds and therefore, the insurer is necessarily bound to the allegations in the underlying complaint.

122 Ill. App. 3d at 305-06, 461 N.E.2d at 474 (citations omitted). Because St. Paul did not defend Campbell under a reservation of rights and did not file a declaratory judgment action prior to settlement, it is now estopped from raising non-coverage as a defense and is bound to the allegations in the underlying complaint.

St. Paul argues further that the present matter is distinguishable from *Envirodyne* because plaintiffs did not tender the Bell lawsuit to St. Paul until after the underlying litigation had concluded by settlement and, therefore, estoppel cannot apply. The court disagrees. St. Paul has admitted that Campbell requested a defense from St. Paul and that St. Paul denied the request. St. Paul also admits that it received a letter on or about April 6, 2001 and another letter in August of 2001 regarding East

14

Lake's counterclaim against Campbell and a tender of defense to Campbell in the Bell lawsuit. As a result, St. Paul was on notice as early as April of 2001 that a lawsuit had been filed against its insured, Campbell. Under Illinois law, the duty to defend arises when an insurer receives actual notice of a claim against the insured. *Cincinnati Cos.* v. *West Am. Ins. Co.*, 183 Ill.2d 317, 328, 701 N.E.2d 499, 504 (Ill. 1998). Unless the insured has knowingly foregone the insurer's assistance, actual notice of the underlying lawsuit triggers the insurer's duty to defend. *Id.* St. Paul assumes that Campbell knowingly chose to forego St. Paul's assistance in the underlying lawsuit because it chose to continue having its defense provided by DPIC. The Illinois Supreme Court has instructed, however, that "the insurer can simply ask the insured if the insurer's involvement is desired, thus eliminating any uncertainty on the question." 183 Ill.2d at 327, 701 N.E.2d at 504. Because there is no evidence that Campbell knowingly chose to forego St. Paul's assistance, St. Paul had a duty to defend Campbell in the Bell lawsuit. This duty to defend was triggered in 2001 when St. Paul received notice that a lawsuit was filed against Campbell and that the complaint in the underlying lawsuit fell within or potentially fell within the scope of the coverage of the St. Paul policy. Therefore, the court finds that St. Paul breached its duty to defend Campbell in the underlying lawsuit and St. Paul is now estopped from asserting any coverage defenses.

## ORDER

For the reasons set forth above, St. Paul's Motion for Summary Judgment [#12] is denied and DPIC's and Campbell's Motion for Summary Judgment [#16] is granted.

Dated: November 22, 2005   Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge